**EXHIBIT A**

**Demand for Arbitration (with Master Service Agreement attached)**



**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*For Consumer or Employment cases, please visit www.adr.org for appropriate forms.*

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| | |
|---|---|
| Name of Respondent: **Ace Icon Ltd. dba Nutra Revenue** | Name of Representative (if known): **Adam Kravitz** |
| Address: **PO Box 1239, Victoria Mahe, Seychelles** | Name of Firm (if applicable): **Kravtiz & Co.** |
| | Representative's Address: **121 Alhambra Plaza, 10th Floor** |

| City: | State: | Zip Code: | City: **Coral Gables** | State: **FL** | Zip Code: **33** |
|---|---|---|---|---|---|
| Phone No.: | Fax No.: | | Phone No.: | Fax No.: | |

| | |
|---|---|
| Email Address: **jay@nutrarevenue.com** | Email Address: |

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

**Please see attached Statement of Claim.**

| Dollar Amount of Claim: $ **265,960** | Other Relief Sought: ☐ Attorneys Fees ☐ Interest ☐ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other |
|---|---|

| Amount enclosed: $ **2,650** | In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☐ Standard Fee Schedule |
|---|---|

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

**Knowledgeable in breach of contract disputes and, preferably, the on-line marketing industry.**

| Hearing locale: **Orange County, Florida** | *(check one)* ☐ Requested by Claimant ☐ Locale provision included in the contract |
|---|---|

| Estimated time needed for hearings overall: hours or **1** days | Type of Business: Claimant: **Performance Marketing Netw** Respondent: **Direct Response Sales Co** |
|---|---|

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other? **Yes**

| Signature (may be signed by a representative): | Date: **October 25, 2016** |
|---|---|
| Name of Claimant: **Mobooka, LLC** | Name of Representative: **Eric Gros-Dubois** |
| Address (to be used in connection with this case): **2910 Maguire Road, Suite 2010** | Name of Firm (if applicable): **EPGD Business Law** |
| | Representative's Address: **2701 Ponce De Leon Blvd., Su** |

| City: **Ocoee** | State: **FL** | Zip Code: **34** | City: **Coral Gables** | State: **FL** | Zip Code: **33** |
|---|---|---|---|---|---|
| Phone No.: **404-474-6111** | Fax No.: | | Phone No.: **786-837-6787** | Fax No.: **305-718-0687** | |

| | |
|---|---|
| Email Address: **steve@convert2media.com** | Email Address: **eric@epgdlaw.com** |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent.

*Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.*

## AMERICAN ARBITRATION ASSOCIATION
## DISPUTE RESOLUTION ARBITRATION

## STATEMENT OF CLAIM

Mobooka, LLC ("**Claimant**" or "**Mobooka**"), a Florida limited liability company, through its counsel EPGD Business Law, submits this Statement of Claim against Ace Icon Ltd., DBA Nutra Revenue ("**Nutra Revenue**"), an offshore company with its best known mailing address being Offshore Incorporation Centre, PO Box 1239, Victoria Mahe, Seychelles and its personal guarantor, Keith Gatehouse ("**Mr. Gatehouse**") (Nutra Revenue and Mr. Gatehouse are collectively referred to herein as "**Respondents**").

        Claimant is a performance marketing network and Nutra Revenue is a former client of Claimant that provides new customers/leads in the area of supplement products. The relationship of the parties is based upon a Master Services Agreement (the "**MSA**") entered into on November 17, 2015 (a true and correct copy of the signed MSA is attached hereto as <u>Exhibit A</u>) and a signed Insertion Order between Mobooka and Respondents ("**Insertion Order**") dated November 17, 2015 (a true and correct copy of such Insertion Order is attached hereto as <u>Exhibit B</u>).

## I.     SUMMARY

        This claim is brought by Mobooka against Respondents seeking payment for monies owed under an open book account. Respondents are in violation of their obligation to Mobooka to pay for services rendered by failing to pay invoices to Claimant totaling the amount of $265,960.00.  Claimant has attempted to resolve this dispute with Respondents and sent a demand letter to Respondents on April 14, 2016 but such efforts were not successful and, therefore, Claimant is forced to file this arbitration demand pursuant to the MSA before the America Arbitration Association in Orange County, Florida in order to enforce its basic contractual right to payment from Respondents.

## II.     BACKGROUND

        The facts surrounding this dispute are very simple and straightforward with signed agreements between the parties evidencing a business relationship and a detailed history of unpaid invoices issued by Claimant to Respondents for services performed.

   **A.** <u>Evidence of Business Relationship</u>.

        On November 17, 2015, Mobooka and Respondents began doing business together in which Mobooka would deliver and/or display advertising campaigns and promotions on behalf of Respondents and would send new customers through its marketing network to Respondents. Such business relationship is evidenced by the MSA signed on November 17, 2015 by Mr. Gatehouse on behalf of Nutra Revenue (see <u>Ex. A</u>) and the Insertion Order signed on November 17, 2015 by Mr. Gatehouse  on behalf of Nutra Revenue (see <u>Ex. B</u>).

Some of the more relevant terms of the MSA that apply to this dispute include the following provisions:

Section 6(b): If Claimant "does not receive a written notification of a disputed bill, with rationale and supporting documentation therefore specifically set forth therein, within three (3) days from the date of the invoice, such invoice will be deemed valid and payable and may not thereafter be disputed."

Section 6(c): "Any late payments will accrue interest equal to one and a half (1.5%) percent per month, or the maximum amount allowable under law, whichever is less, compounded monthly…. [Claimant] shall be entitled to recover all reasonable costs of collection (including agency fees, attorneys' fees, expenses and costs) incurred in attempting to collect payment from [Respondents]."

Section 6(j): "The individual signing this agreement (the "Guarantor") guarantees and agrees to pay any and all indebtedness of any nature incurred by [Respondent] to [Company]. This guarantee shall be a continuing, unconditional, and irrevocable guarantee to repay and indemnify such indebtedness of [Respondents]."

Section 11: This Agreement shall be governed by the laws of the United States and the State of Florida without respect to choice of law rules. The Parties consent to have all disputes regarding this agreement resolved by binding arbitration before the American Arbitration Association, Commercial Division. The parties agree to conduct the arbitration in the county of Company's principal office and each party shall bear the costs of such arbitration…. Company shall be entitled to recover all reasonable costs of collection (including attorney's fees, in-house counsel costs, expenses and costs) incurred in attempting to collect payment from [Respondents]. The prevailing party in any Arbitration shall be entitled to an award of attorney fees and costs for such arbitration."

Mr. Gatehouse signed the MSA and the Insertion Order and, therefore, in accordance with Section 6(j) of the MSA is the Guarantor of all debt owed by Nutra Revenue to Mobooka and, therefore, Mr. Gatehouse is, as an individual, also made a party to this arbitration.

**B.** Nonpayment of Invoices.

To date, invoices of Mobooka show that Respondents owe a total of $265,960 for services rendered by Mobooka to Respondents (referred to herein individually as an **"Invoice"** or collectively as **"Invoices"**) (copies of the Invoices are attached hereto as Exhibit C). Despite efforts by Mobooka to collect the remaining balance on Respondents account, no payment has been made despite documented promises by Respondents for forthcoming payment, and neither have Respondents ever disputed any Invoices in accordance with Section 6(b) of the MSA.

A demand letter was sent to Respondents on April 14, 2016 which, unfortunately, did not result in resolution of this matter and, therefore, this arbitration is being filed in accordance with the provisions of the signed MSA (see MSA, Section 11).

### III.   LEGAL CLAIMS AND DAMAGES

Claimant and Respondents had countless transactions between them, an account existed between Claimant and Respondents in which the parties had a series of payments and charges, Claimant prepared an itemized statement of that account and Respondents owe money on that account.  Claimant therefore prays for an award against Respondents as follows: (i) for an award in the amount of $265,960.00; (ii) interest at the contracted rate being 1.5% per month compounded monthly or the highest amount permitted by law; (iii) attorney fees and arbitration costs; (iv) collection costs; and (v) any other costs and relief that the arbitrator deems just and proper.

# EXHIBIT

# A



## MOBOOKA, LLC MASTER SERVICE AGREEMENT

This **Master Service Agreement** ("**Agreement**") is entered into by and between Mobooka, LLC, on the one hand (hereinafter referred to as "**Company**") and the customer identified on the IO (hereinafter referred to as "**Advertiser**") for the mutual promises contained herein and other good and valuable consideration, receipt and adequacy of which are hereby acknowledged. This Agreement and the accompanying and subsequent Insertion Order ("**IO**") shall define the Company's and Advertiser's obligations with respect to Company's delivery or display of advertising campaigns and promotions on Advertiser's behalf ("**Campaigns**"). Each IO submitted by Advertiser shall incorporate this Agreement. In the event of a conflict between any terms of an IO and this Agreement, the IO shall take precedence only where the Agreement section is specifically referenced and the IO is signed by an authorized representative of the Company.

1. *Term and Termination.*

a. Term. The term of this Agreement shall begin upon the submission of an executed IO by Advertiser to Company. Such IO shall be construed as an acceptance by Advertiser of all the rates, terms and conditions under which advertising is sold at that time.

b. Termination of Agreement. Either party may terminate this Agreement upon thirty (30) days prior written notice to the other party, for any reason or for no reason. This Agreement may be terminated at any time by a party, effective immediately upon written notice, if the other party: (i) files a voluntary petition in bankruptcy; (ii) makes an assignment for the benefit of creditors; (iii) breaches any of the material terms of this Agreement if such breach is not remedied within three (3) business days from the receipt of written notice of such breach; or (iv) reasonably believes that the other party is in violation of an applicable regulation, statute or law in the performance of this Agreement. Notwithstanding such termination, the Advertiser shall remain liable to each other for all payment obligations incurred pursuant to this Agreement.

c. Cancellation of Campaign. Company expressly reserves the right to: (i) refuse any advertising request, cancel any Campaign, or change any Campaign that does not completely conform to every material detail, instruction, method, and guideline set forth in the Insertion Order; (ii) refuse any Creative(s) that does not arrive forty-eight (48) hours prior to the start date; (iii) refuse or cancel the use of any Campaign that it deems, in its reasonable discretion, violates an applicable regulation or statute of the United States; or (iv) refuse at any time to publish or transmit any copy, photograph or illustration of any kind for any reason including those that it believes, in its reasonable discretion, are an invasion of privacy, are degrading, libelous, unlawful, profane, obscene, pornographic, tend to ridicule or embarrass, are in bad taste, or which in its reasonable discretion are an infringement on a trademark, trade name, or copyright belonging to others, or is otherwise inappropriate. All Campaigns are subject to capacity limitations which include software, hardware, bandwidth, inventory availability, payment terms, credit history, creative performance, and market pricing limitations. Any Campaign rejected by Company may be replaced by Advertiser; provided that any such replacement material must be in writing and accompanied by appropriate material identifying the Campaign that it is to replace.

2. *Advertiser's Campaign.*

a. Advertising Content and Creative. Advertiser shall provide all creative and substantive content materials ("**Advertising Content**") required for marketing the Campaign, including but not limited to banners, language/text for promotional e-mail text, links, key words, and any other creative content as needed, including but not limited to the use of alternative text-based creative. Advertiser is solely responsible for the substantive content and creative of each advertisement it submits or approves in writing. Advertiser agrees that Company exercises absolutely no editorial control over content. Advertiser is solely responsible for the substantive content of each advertisement. Company reserves the right to reject, suspend, or cancel any Advertising Content which in the sole opinion of the Company may violates an applicable law or may subject it to civil sanctions or is otherwise inappropriate. By submitting or approving any email creative or content, Advertiser represents and warrants that (i) the submission meets all applicable regulations and laws in effect governing the submission at the time of such submission; (ii) accurately reflects advertiser's product or service being advertised; and (iii) does not violate any applicable law or regulation governing deceptive advertising or consumer protection laws.

b. Functionality. Advertiser agrees to confirm the correct function of all Creative(s) supplied to Company within twenty-four (24) hours of the Campaign start. If no confirmation is received within this time frame, Company shall presume that Creative(s) are functioning properly and Advertiser agrees to pay for all impressions, clicks or leads derived from the Creative(s) as measured by Company. All problems related to Creative(s) should be immediately brought to the attention of the Company account executive for Advertiser. Company is not liable for errors in position and/or placement of the Creative(s), or typographic errors of any kind.

c. Allowed Alterations. Advertiser agrees to allow Company to make changes or alterations to the Creative(s) for the sole purpose and intent of matching it to the medium of delivery. Neither Company nor its affiliates shall make any changes to content of

1

Initials



Advertisement. Company may, at its option, modify the flight date of a Campaign if the Creative(s) or linking URL's are not delivered on time or there are delays due to third party ad-serving, inventory fluctuation or other issues beyond its control. Company shall notify Advertiser of any changes it intends to make to the Creative(s) in accordance with this Section 2(b).

d. License. Advertiser hereby grants to Company and its third party publishers a nonexclusive, limited, worldwide, royalty-free, revocable license to market, display, perform, copy, transmit, distribute, and promote the Campaign(s) in connection with its obligations hereunder.

e. Hosted Campaigns. Advertiser understands that Company, in due diligence, cannot monitor all host sites for appropriate content and makes no representations with respect to user-generated content on any website where Campaigns are placed. If Advertiser reasonably determines that the placement of any Campaign by Company harms the goodwill or reputation of Advertiser or disparages or brings Advertiser into disrepute, then Company shall notify all publishers and affiliates to cease mailing and removal of the Campaign shall be completed within three (3) business days following Advertiser's notice thereof to Company; provided, however, that if Company reasonably believes that removal of a Campaign from a website will have a material impact on Company's ability to perform in accordance with the applicable Insertion Order, Company may have an extension of the flight dates or other accommodation so long as Company finds a suitable host site through its due diligence.

3.  *Tracking.*

a. Tracking Pixel. Conversions, sales, leads, and/or clicks ("**User Actions**") shall be tracked by Company. Company's tracking count shall be used for all purposes under this Agreement. Company shall have the right to place tracking pixel on Advertiser's website, as may be required to track and provide estimated live statistics for Company's affiliates. The technical specifications of the tracking system and its delivery methods must be met to the reasonable satisfaction of Company before any advertising or ad-serving will be provided by Company. If Advertiser removes or manipulates the tracking code at any time during the Campaign, without express written permission from Company, Company may suspend performance and, if applicable, Advertiser agrees to pay Company for the days during which tracking code was absent or manipulated based on the average daily conversion measurements (using daily click counts and/or conversions for the seven (7) days prior to the tracking code being removed or manipulated). Advertiser shall have reports online or submitted daily to Company via-mail in Excel format.

b. Advertiser Tracking [if applicable]. Where Advertiser's tracking mechanism is used, Advertiser shall provide a login where Company can retrieve daily and month's end summary reports reflecting the exact number of units delivered. Company, in its reasonable discretion and in consultation with Advertiser, will determine the form of said reports.

4.  *Email Marketing Campaigns.*

a. Campaign Content. To the extent that a Campaign provides for or otherwise permits marketing by e-mail, the Advertising Content provided by Advertiser shall also include, accurate and truthful offer descriptions (in text and html formats), terms and conditions (if applicable), the Advertiser's postal address and a functioning unsubscribe mechanism which, when activated by a user, will actually and permanently remove the user's email address from the Advertiser's database within 10 days of request receipt and, a non-misleading and accurate "Subject Line" and/or "From Line" and any other information necessary to comply with applicable laws and regulations including but not limited to the CAN-SPAM Act of 2003.

b. Suppression List. Advertiser agrees to maintain and deliver a suppression list containing the e-mail addresses of those individuals who have opted out or unsubscribed from receiving communications from the Advertiser (the "**Suppression List**"). Advertiser shall further provide an updated Suppression List to Company once every seven (7) days for the duration of the offer. Each party shall use best practices to prevent use or disclosure of the Suppression List for any purpose other than to honor the request of individuals to opt out or unsubscribe from receiving communications and shall treat such Suppression lists as confidential information as provided herein.

5. *Exclusive Campaigns / Non Circumvention*

a.      Exclusive Campaigns. In the event that Advertiser has agreed to exclusive distribution rights to Company in the IO, Advertiser shall not, without the prior written consent of Company, engage in or be involved with advertising, marketing or distributing of any

*KMb* Initials



products subject to the exclusive campaign on the world wide web, for a period commencing on the date of the AGREEMENT or applicable IO which ever is later, and ending on the end date of the IO or AGREEMENT whichever is later. Advertiser acknowledges and agrees to the following: (i) the time restrictions in this Section 6 are reasonable; (ii) the restrictions imposed by this Section 6 will not impair Advertiser's ability to promote and further its business model and (iii) monetary damages would be insufficient in the event of a breach of this covenant of exclusivity, and Company may seek injunctive relief to enforce this Agreement without proof of actual damages or the posting of a bond.

b.    Non-Circumvention.  During the term of this Agreement and for a period of six (6) months after expiration or termination of the Term, Advertiser agrees and acknowledges that it will not, outside of any pre-established relationships with activity within the last 6 months, knowingly take any action to circumvent the relationship with Company by doing business with or directly soliciting other online marketing service providers that are currently working with Company to provide to it services similar to the services provided by Company. To the extent applicable, Advertiser further agrees that during the Term and for a period of six (6) months after the expiration or termination of the Term, it will not, outside of any pre-established relationships with activity within the last 6 months, knowingly engage, contract with, work with, license with, enter into and/or execute any performance-based online advertising and/or marketing relationship with any advertising network, website, newsletter, search engine, e-mail list, or any other type of Internet property (collectively, the "**Publishers**") within any advertising network operated by Company, which is comprised of Publishers (the "**Network**").  In the event a Publisher does contact Advertiser and Advertiser finds out at a later time that such Publisher is a Publisher within the Company's Network, then Company shall notify such Publisher immediately that it must work directly with Company and immediately halt any marketing campaigns it is conducting with such Publisher. Both parties agree and acknowledge that if Advertiser violates its obligations under this Section, Company will suffer irreparable injury and shall be entitled to: (a) liquidated damages in the amount of fifty percent (50%) of the gross revenues resulting from sales conducted by Advertiser through the advertising and/or marketing efforts of such Publisher(s), (b) injunctive relief, and (c) any other remedies Company may have at law or in equity.

### 6. Billing and Payment.

a. Invoicing.  For each offer provided by a party hereunder, the parties will enter into an IO specifying the price and other offer specifics.  Any inconsistencies between the terms and conditions of the IO and this Agreement shall be resolved in favor of this Agreement.  Advertiser's payment obligations shall be determined in accordance with the pricing specified in each IO and the amount of User Actions as determined herein.  Upon approved credit, terms are net three (3) days from the end of the previous week (which may be sent by email and/or postal mail).  All payments must be in U.S. funds unless specified differently on the IO.  Where payment is made by credit card. Advertiser expressly agrees not to charge back any amounts and will instead follow the dispute resolution procedures as specified herein.

b. Disputed Invoice.  In the event of a dispute between Advertiser and Company regarding amounts due, or upon failure of a third-party's tracking mechanism Advertiser agrees that Company's tracking count shall be applied.  Advertiser agrees that in no event, and under no circumstance, will data provided by any Company representative constitute final billing numbers.  Only invoices sent directly to Advertiser are to be construed as representative of billable amounts.  In the event that Company does not receive a written notification of a disputed bill, with rationale and supporting documentation therefore specifically set forth therein, within three (3) days from the date of the invoice, such invoice will be deemed valid and payable and may not thereafter be disputed.  Advertiser acknowledges Company's reliance upon this provision in making payments to participants in its network.

c. Late Payments.  Any late payments will accrue interest equal to one and a half (1.5%) percent per month, or the maximum amount allowable under law, whichever is less, compounded monthly.  Advertiser will be charged twenty five dollars ($25) for payments by checks that are returned due to insufficient funds.  Company shall be entitled to recover all reasonable costs of collection (including agency fees, attorneys' fees, expenses and costs) incurred in attempting to collect payment from Advertiser.

d. Reporting Requirements.  Advertiser shall provide a weekly and a month's end summary report reflecting the exact number of Units delivered.  The Company, in its reasonable discretion and by consultation with Advertiser, will determine the form of said reports.  All delivery amounts and all agreements are subject to ten (10%) percent over/under delivery and Advertiser shall pay for any over-delivery within the above tolerance.  Company has the final responsibility for the determination of Units delivered.  Advertiser shall be obligated to retain books and records pertaining to the Units delivered and other data necessary to compute the charges hereunder for at least one (1) year after the conclusion of each Campaign.  Company shall have the right to audit such books and records. If the audit reveals an underpayment, Advertiser shall promptly pay to Company such underpayment along with past due interest charges from the time originally due until paid.  If the amount of the underpayment is more than five (5%) percent, Advertiser shall also be obligated to pay to Company its reasonable audit costs.

*KNb* Initials



h. Late or Unpaid Invoices. In the event that Company must incur expenses related to collection of any outstanding balance and/or late fees, Advertiser shall immediately pay Company's reasonable expenses associated with said collection, including, without limitation, reasonable attorney's and collection agency's fees. Company, in its sole discretion, may remove the Advertisement from the Company Network and/or terminate this Agreement immediately if Advertiser fails to pay any amount due hereunder.

i. Offset or Chargeback. No offset or chargeback may be taken for any non-viable or duplicate leads. Company shall determine in its sole discretion what constitutes a non-viable Lead. Without limiting the breadth of the foregoing, non-viable Leads shall include only Leads with incomplete contact information (no email address, no phone number, and no physical address); Leads from non-United States residents unless such Leads are expressly permitted in the IO, or Leads from consumers under the age of 18. It is the responsibility of the Advertiser to insure the accuracy of Lead request information in the IO. Company may, in its sole discretion, replace a non-viable Lead upon determination of a non-viable lead and Advertiser agrees this is the sole remedy for receipt of a non-viable Lead.

j. Personal Guaranty. The individual signing this agreement (the "Guarantor") guarantees and agrees to pay any and all indebtedness of any nature incurred by Advertiser to Company. This guarantee shall be a continuing, unconditional, and irrevocable guarantee to repay and indemnify such indebtedness of Advertiser. Guarantor agrees that all rights, remedies, and recourses afforded to Company by reason of this personal guarantee or otherwise are separate and cumulative and may be pursued separately, successively, or concurrently, as occasion therefore shall arise, and are nonexclusive and shall in no way limit or prejudice any other legal or equitable right, remedy, or recourse that Company may have. Guarantor hereby waives notice of default, non-payment, and notice thereof and consents to any modification or renewal of the agreement hereby guaranteed. This guarantee may be assigned by Company to any person or entity taking assignment of the underlying debt, without notice to Guarantor, and shall be fully enforceable by said assignee. As a condition precedent to the making of a credit extension to Advertiser, the undersigned officer, director or owner of Advertiser does hereby personally guaranty to Company the prompt punctual and full payment of all monies now or hereinafter due Company from Advertiser. This guaranty is unlimited as to the amount or duration and shall remain in full force and effect notwithstanding any extension, compromise, adjustment, forbearance, waiver, release or discharge of any other party or guarantor or release in whole or in part of any security granted for credit indebtedness or compromise or adjustment thereto, and the undersigned waives all notices thereto. Guarantor further agrees to pay all costs, interest, and reasonable attorney's fees incurred by Company in collecting any amounts hereby guaranteed. In the event that any of this guarantee shall be construed by a court of competent jurisdiction to be unlawful or unenforceable and if the offending provision can be reformed to effect the clear intention of the parties herein, then, the offending provision shall be so reformed, and the remainder of the guarantee shall remain in full force and effect as written. If the provision cannot be reformed to affect the clear intention of the parties, then, this guarantee shall be deemed to be reformed to exist as now written but without the offending provision.

### 7. *Advertiser Warranties.*

a. Advertiser represents and warrants that:  (i) it holds all necessary rights to permit the use of all Creative provided to Company under this Agreement;  (ii) that the use, reproduction, distribution, transmission or display of any Creative and any materials to which users can link, or any products or services made available to users through the Creative will not (A) violate any law (including but not limited to the Federal Trade Commission Act, CAN-SPAM Act of 2003 and/or any applicable rules or regulations of the Federal Trade Commission, UK Data Protection Act of 1998 and Amendments thereto and if applicable all laws of the United Kingdom governing advertising practices on the Internet), give rise to criminal or civil liability or infringe any copyright, patent, trademark or service mark, trade secret rights or any other personal, moral, contract, property or privacy right of any third party; (B) contain or promote viruses, obscene, abusive, violent, bigoted, hate-oriented, cracking, hacking or warez content or conduct; or (C) encourage conduct that would constitute Unlawful Conduct or Offensive Conduct; (iii) it has a reasonable basis for all claims made within the Creative, possesses appropriate documentation to substantiate such claims and shall fulfill all commitments made in its Campaigns; (iv) the landing page for each Campaign (i.e., the Advertiser's website page where a consumer is directed when the consumer clicks on the Creative, fills in a registration form or takes a similar action) contains a prominent link to Advertiser's privacy policy, which policy provides, at a minimum, adequate notice, disclosure and choices to consumers regarding Advertiser's use, collection, disclosure and security of their personal information; (v) all consumer data collected pursuant to this Agreement shall only be used for legal purposes; (vi) no data collected pursuant to this Agreement shall be used for  online preference marketing based on a consumer's medical condition absent their express consent obtained after clear and conspicuous notice of such potential use; (vii) no Campaign is targeted to children under the age of eighteen (18) and/or offers products or services that are illegal for minors to buy, possess or participate in; and  (ix) it will not load any computer program onto an individual's computer, in connection with the Campaign, including without limitation programs commonly referred to as adware or spyware but excluding cookies, without Company's prior written approval and the individual's express consent after receiving clear and conspicuous notice about the nature of the application to be downloaded.

*KMG* Initials



b. Advertiser represents and warrants that: i) All Creative provided to Company was created without any contribution of any kind from Company, including without limitation editorial control or approval; ii) Any suggestions regarding content that Advertiser received from Company are made "as-is" and without any warranty; and iii) Advertiser has had all Creative reviewed by competent legal counsel and solely assumes all responsibility for the Creative.

c. Advertiser agrees to indemnify and hold Company, its third party publishers and list providers and their respective affiliates, employees, officers, agents, directors and representatives, harmless from all allegations, claims, actions, causes of action, lawsuits, damages, liabilities, obligations, costs and expenses (including without limitation reasonable attorneys' fees, court costs and witness fees) arising out of or related to any third party claim of a breach of warranty or breach of this Agreement. The indemnity obligations of this paragraph are contingent on giving prompt written notice of any such claim. Advertiser will have sole control over the litigation or settlement of such claim, provided that any settlement shall be subject to the Company's approval, which shall not be unreasonably withheld.

**8. Mutual Warranties.**

Each party represents and warrants that it has the full right, power, legal capacity, and authority to enter into, deliver and fully perform under this Agreement and that its performance hereunder will fully comply with all applicable laws, rules and regulations, including but not limited to the CAN-SPAM Act of 2003 as amended or interpreted from time to time. Any agency executing this Agreement on behalf of its client represents and warrants that it has the authority to bind its client to the terms stated herein and remains jointly and severally liable for all obligations under this Agreement.

**9. Limitations of Warranties and Liability.**

a. THE ADVERTISING SERVICE PROVIDED BY COMPANY, ITS USE AND THE RESULTS OF SUCH USE ARE PROVIDED ON AN "AS IS," "AS AVAILABLE" BASIS. TO THE FULLEST EXTENT PERMISSIBLE PURSUANT TO APPLICABLE LAW, COMPANY MAKES NO WARRANTIES (INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT), GUARANTEES, REPRESENTATIONS, PROMISES, STATEMENTS, ESTIMATES, CONDITIONS, OR OTHER INDUCEMENTS, EXPRESS, IMPLIED, ORAL, WRITTEN, OR OTHERWISE, EXCEPT AS EXPRESSLY SET FORTH HEREIN. COMPANY DOES NOT WARRANT OR GUARANTEE CONVERSION RATES, PAY-UP RATES, RESPONSE RATES OR ABILITY TO CONVERT THE RESPONSES INTO SALES. COMPANY DOES NOT WARRANT OR GUARANTEE THE PROFILE OR DEMOGRAPHICS OF A RESPONDENT. COMPANY DOES NOT GUARANTEE TO MATCH COLORS, TEXT, PHOTO IMAGE OR SCREEN DESIGN. ALL ORDERS ARE CONTINGENT UPON COMPANY'S ABILITY TO PROCURE NECESSARY ON-LINE ACCESS AND COMPANY IS NOT RESPONSIBLE FOR DELAYS CAUSED BY ACCIDENT, WAR, ACT OF GOD, EMBARGO, COMPUTER SYSTEM FAILURE, OR ANY OTHER CIRCUMSTANCE BEYOND ITS CONTROL. COMPANY WILL MAKE EVERY EFFORT TO MEET SCHEDULED DELIVERY AND ONLINE DATES, BUT MAKES NO GUARANTEE AND ACCEPTS NO LIABILITY FOR ITS FAILURE TO MEET SAID DATES.

b. NEITHER PARTY SHALL BE LIABLE FOR ANY PUNITIVE DAMAGES OR INDIRECT OR CONSEQUENTIAL LOSS, DAMAGE, COSTS OR EXPENSE OF ANY KIND WHATSOEVER AND HOWSOEVER CAUSED, WHETHER ARISING UNDER CONTRACT, TORT, NEGLIGENCE, STATUTE OR OTHERWISE, INCLUDING, (WITHOUT LIMITATION) LOSS OF PRODUCTION, LOSS OF OR CORRUPTION TO DATA, LOSS OF PROFITS OR OF CONTRACTS, LOSS OF OPERATION TIME AND LOSS OF GOODWILL OR ANTICIPATED SAVINGS, EVEN IF ADVISED OF THEIR POSSIBILITY EXCEPT IF SUCH LOSSES ARE THE RESULT OF FRAUD ON THE PARTY OF COMPANY. IN ANY EVENT, COMPANY'S TOTAL OBLIGATIONS AND/OR LIABILITY, IF ANY HEREUNDER, SHALL BE LIMITED TO THE AMOUNTS PAID TO IT FOR THE ADVERTISING CAMPAIGN IN QUESTION.

c. The Provisions of this Section 9 are an essential element of the benefit of the bargain reflected in this AGREEMENT.

**10. Proprietary Matters.**

a. Each party may use Confidential Information received from the other party only in connection with and to further the purposes of this Agreement and may only provide such Confidential Information to its respective directors, employees and advisors who have a "need to know" such Confidential Information and who are obligated to honor, the terms of this Agreement. The fact that Confidential Information does not carry a proprietary legend, or is transmitted orally, shall not act as a waiver to deprive such information from protection under this Agreement.

b. Section 10(a) shall not apply to information which belongs to the Receiving Party or is: (i) already known by the Receiving Party, (ii) publicly known or becomes publicly known through no unauthorized act of the Receiving Party, (iii) lawfully received from a

*KMG* Initials



third party without restriction on use or disclosure if, to the Receiving Party's knowledge, such third party had the legal right to disclose such information, or (iv) independently developed by the Receiving Party without use of the Disclosing Party's Confidential Information. In addition a party may disclose Confidential Information hereunder if pre-approved in writing by the other party for disclosure, or if disclosure is required by law, governmental agency or rule, or court order, so long as the party required to disclose the information provides the other party with timely prior notice of such requirement.

c. The parties agree that during the term(s) of this Agreement and for a period of one year thereafter, they will not directly or indirectly solicit the employment of any of the other party's employees, officers or directors, provided, that employment solicitations directed to the general public shall not be prohibited pursuant to this Section.

d. Upon completion or termination of this Agreement or the written request of the Disclosing Party at any time, the Receiving Party shall, within five (5) business days from such completion, termination or request, return all copies of Confidential Information to the Disclosing Party or certify, if so requested, in writing that all copies of Confidential Information have been destroyed; except for material reasonably required to be maintained by counsel. A Receiving Party may return Confidential Information, or any part thereof, to the Disclosing Party at any time.

e. During the term of this Agreement and for twelve (12) months hereafter, Advertiser shall not directly or indirectly solicit any on-line publisher, Web Site, or email provider that is affiliated with Company. In the event that Advertiser does so directly contract with such affiliate or in any other way violates this Agreement then Advertiser shall pay Company an additional commission equal to what the Company would otherwise have earned had Advertiser not violated this section 10. Any agency executing this Agreement represents and warrants that it has the authority to bind its client to the terms stated herein and remains jointly and severally liable for all obligations under this Agreement.

f. The parties agree and understand that a material breach of this Section 10 will cause the non-breaching party to suffer irreparable harm and that monetary damages may be inadequate to compensate for such damage. Accordingly, the parties agree that in such event, the non-breaching party will, in addition to all other remedies, may be entitled to preliminary and permanent injunctive relief without the necessity of showing any actual damage or posting a bond. The foregoing remedy is a material, bargained for basis of this Agreement and has been taken into account in each party's decision to enter into this Agreement.

*11. Dispute Resolution.*

This Agreement shall be governed by the laws of the United States and the State of Florida without respect to choice of law rules. The Parties consent to have all disputes regarding this agreement resolved by binding arbitration before the American Arbitration Association, Commercial Division. The parties agree to conduct the arbitration in the county of Company's principle office and each party shall bear the costs of such arbitration. The parties specifically waive any international treaties or other international law which may govern the court or location of resolution of any dispute between them. This provision was a bargained for relinquishment of both parties rights to jurisdiction in their respective states or countries. The Parties waive the personal service of any process upon them and agree that service may be completed by overnight mail (using a commercially recognized service) or by U.S. mail with delivery receipt to the address stated in this Agreement. Company shall be entitled to recover all reasonable costs of collection (including attorney's fees, in-house counsel costs, expenses and costs) incurred in attempting to collect payment from Advertiser. The prevailing party in any Arbitration shall be entitled to an award of attorney fees and costs for such arbitration.

*12. Notice.*

All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed given at the time such communication is sent by registered or certified mail (return receipt requested), or recognized national overnight courier service, or delivered personally, to the following addresses (or at such other address for a party as shall be specified by like notice): If to Company, to the attention of both the President at 2910 Maguire Road, Suite 2010, Ocoee, FL 34761 with a courtesy copy to with a courtesy copy to IFRAH LAW, PLLC, at 1717 Pennsylvania Ave, N.W, Suite 650 Washington, DC 20006. If to Advertiser, to the person listed as the contact person and at the address listed on the initial IO.

*13. Independent Contractors.*

6

*KmG* Initials



Each party is an independent contractor. Any intention to create a joint venture or partnership between the parties is expressly disclaimed. Except as set forth herein, neither party is authorized or empowered to obligate the other or to incur any costs on behalf of the other without the other party's prior written consent.

### 14. Entire Agreement, Modification, Assignment.

This Agreement and exhibits or addendum thereto constitutes a valid and binding agreement between the parties, and has been duly executed by an authorized representative of each party. This Agreement and any exhibits or addenda thereto is intended to be the parties' complete, integrated expression of the terms of their agreement and any prior agreements or understandings with respect to such subject matters are superseded hereby and fully merged herein, and may only be modified in writing by authorized representatives of the parties. The terms and conditions hereof shall prevail exclusively over any written instrument or Insertion Order submitted by Advertiser even if signed by Company unless this Agreement is expressly amended by an addendum attached hereto that references this Agreement and the specific provisions to be modified. No interlineations to this Agreement shall be binding unless signed by both parties. In the event that a party is required to digitally sign or agree to additional terms when using the other's website, the parties acknowledge and agree that such digital agreement is inconsequential and in no way binding; that it is the result of a technical requirement, which cannot be altered, in order to view stats and access Advertising Content. Therefore, any terms which appear on the other's online advertising network or website are to be disregarded and deemed non-effective, and shall be superseded by this Agreement. Neither party may assign this Agreement without express written permission of the other party.

### 15. Survival & Severability.

Any obligations which expressly or by their nature are to continue after termination, cancellation, or expiration of this Agreement shall survive and remain in effect after such happening, including without limitation, Sections 6, 7, 9-11, 14.15 and 17. Each party acknowledges that the provisions of this Agreement were negotiated to reflect an informed, voluntary allocation between them of all the risks (both known and unknown) associated with the transactions contemplated hereunder. Further, all provisions are inserted conditionally on their being valid in law. In the event that any provision of this Agreement conflicts with the law under which the Agreement is to be construed or if any such provision is held invalid or unenforceable by a court with jurisdiction over the parties to the Agreement, (i) such provision will be restated to reflect as nearly as possible the original intentions of the parties in accordance with applicable law; and (ii) the remaining terms, provisions, covenants, and restrictions of the Agreement will remain in full force and effect.

### 17. Remedies, Waiver.

Except as otherwise specified, the rights and remedies granted to a party under this Agreement are cumulative and in addition to, not in lieu of, any other rights and remedies which the party may possess at law or in equity. Failure of either party to require strict performance by the other party of any provision shall not affect the first party's right to require strict performance thereafter. Waiver by either party of a breach of any provision shall not waive either the provision itself or any subsequent breach.

### 18. Counterparts.

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute one and the same instrument. For purposes hereof, a facsimile copy of this Agreement shall be deemed to be an original.

 Initials



By executing this Agreement, the parties acknowledge that they have reviewed the terms and conditions incorporated herein and agree to be legally bound by the same. The parties hereby cause this Agreement to be executed by their duly authorized representatives and made effective as of the Effective Date.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be duly executed as of the date set forth above.

ADVERTISER

By: _Keith McIntohse_

Printed Name: _____

Title: _Director_

Company: _Ace Icon Ltd_

Address: _PO Box 1239, Offshore Incorporations centre_

_Victoria, Mahe, Seychelles_

Email: _keith@sentry.marketing_

Fax: _____

Guarantor: _____

MOBOOKA, LLC

By: _____

Printed Name: _____

Title: _____

8

_____ Initials